UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

*In re* Frito-Lay North America, Inc. All Natural
Litigation

**MEMORANDUM & ORDER**
12-MD-2413 (RRM)(RLM)

----------------------------------------------------------X

ROSLYNN R. MAUSKOPF, United States District Judge.

In this consolidated multi-district litigation, plaintiffs bring a putative class action

grounded in various federal and state-law claims, alleging that defendant Frito-Lay North

America Inc., and its parent company, defendant PepsiCo, Inc., deceptively labeled and marketed

as "All Natural" various Tostitos, SunChips, and Fritos Bean Dip products when, in fact, the

products contained unnatural, genetically-modified organisms.  Before the Court are defendants'

motions to dismiss, (Doc. No. 23), and to take judicial notice of certain documents in support of

their motion to dismiss, (Doc. No. 25).  Plaintiffs oppose both motions, (Doc. Nos. 27, 28), and

defendants filed replies, (Doc. Nos. 29, 30).  For the following reasons, the motion to take

judicial notice is granted, and the motion to dismiss is granted in part and denied in part.

## BACKGROUND

### I.  Facts Alleged

Plaintiffs Chris Shake, Julie Gengo, Valarie Zuro, and Lisa Summerlin (collectively

"plaintiffs") are purchasers of various Tostitos, SunChips, and Fritos Bean Dip products.[1]  Frito-

---

[1] Chris Shake, a resident of New York, purchased various Tostitos, SunChips, and Bean Dip products.  (FAC ¶ 17.)
The First Amended Complaint does not allege which specific products Shake purchased.  Julie Gengo, a resident of
California, purchased Tostitos Multigrain Tortilla Chips, Tostitos Scoops Tortilla Chips, Tostitos Artisan Recipes
Fire-Roasted Chipotle Tortilla Chips, SunChips Original Flavored Multigrain Snacks, SunChips French Onion

Lay North America, Inc. ("Frito-Lay") manufactures, markets, advertises, distributes, and sells Tostitos, SunChips and Bean Dip products.  (*Id.* ¶ 24.)  PepsiCo, Inc. ("PepsiCo") is the parent company of Frito-Lay, and wholly owns Frito-Lay.  (*Id.* ¶ 22.)

The Tostitos and SunChips products that plaintiffs purchased were all stamped with the following "All Natural" label:



(*Id.* ¶ 37.)

The Fritos Bean Dip products that plaintiff Shake purchased were all stamped with the following "All Natural" label:



---

Flavored Multigrain Snacks, and SunChips Harvest Cheddar Flavored Multigrain Snacks.  (*Id.* ¶ 18.)  Valarie Zuro, also a resident of California, purchased Tostitos Restaurant Style Tortilla Chips, Tostitos Crispy Rounds Tortilla Chips, Tostitos Multigrain Tortilla Chips, Tostitos Scoops Tortilla Chips, Tostitos Restaurant Style with a Hint of Lime Tortilla Chips, Tostitos Artisan Recipes Fire-Roasted Chipotle Tortilla Chips, SunChips Original Flavored Multigrain Snacks, SunChips Garden Salsa Flavored Multigrain Snacks, SunChips French Onion Flavored Multigrain Snacks, and SunChips Harvest Cheddar Flavored Multigrain Snacks. (*Id.* ¶ 19.)  Lisa Summerlin, a resident of Florida, purchased Tostitos Restaurant Style Tortilla Chips and Tostitos Scoops Tortilla Chips.  (*Id.* ¶ 20.)

(*Id.*)  The Tostitos, SunChips, and Bean Dip products all allegedly contain "unnatural, genetically-modified organisms ("GMOs")."  (*Id.* ¶ 1.)  GMOs are "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally."  (*Id.* ¶ 6.)  One of the ingredients in all of these products – corn – has been genetically modified.  (*Id.* ¶ 39.) Because the products contain genetically modified corn, plaintiffs allege, they are not in fact "natural" or "all natural."  (*Id.* ¶ 42.)  In fact, being "unnatural" is, according to plaintiffs, a defining characteristic of genetically modified foods.  (*Id.*)

As alleged, defendants charged, and the plaintiffs paid, a premium price for the products as compared to other like products not bearing an "All Natural" label.  (*Id.* ¶¶ 65, 64.)  In purchasing the products at a premium price, plaintiffs assert that they relied on defendants' misleading and deceptive misrepresentations that the products were made of all natural ingredients.  (*Id.* ¶ 63.)  Had plaintiffs known that the products were not all natural, but instead contained GMOs, they claim they would not have purchased the products.  (*Id.* ¶ 67.)

## II.  Procedural History

Shake filed his action in this Court in January 2012.  Gengo and Zuro filed actions in the U.S. District Court for the Central District of California.  Those actions were transferred to this Court, and consolidated with Shake's case.  The plaintiffs filed the First Amended Complaint on July 3, 2012, adding Summerlin as a named plaintiff.

Plaintiffs seek to represent, in the alternative, the following classes: (1) nationwide classes seeking declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) and monetary damages pursuant to Fed. R. Civ. P. 23(b)(3) for violations of the Magnuson-Moss Warranty Act and the statutory and common law of New York; or (2) a multi-state class of residents of New York, California, and Florida (the "New York-California-Florida classes")

seeking declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) and monetary damages pursuant to Fed. R. Civ. P. 23(b)(3) for violations of the Magnuson-Moss Warranty Act and the statutory and common law of New York; or (3) separate state-based classes wherein plaintiff Shake represents New York residents (the "New York classes"), plaintiffs Gengo and Zuro represent California residents (the "California classes"), and plaintiff Summerlin represents Florida residents (the "Florida classes"), each seeking declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) and monetary damages pursuant to Fed. R. Civ. P. 23(b)(3) for violations of their respective states' statutory and common law.

Plaintiffs bring thirteen causes of action against defendants: (I) breach of warranty, in violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.* (brought on behalf of the nationwide classes); (II) deceptive acts and practices, in violation of N.Y. Gen. Bus. Law ("GBL") § 349 (brought on behalf of the nationwide classes, New York-California-Florida classes, and New York classes); (III) false advertising, in violation of N.Y. Gen. Bus. Law § 350 (brought on behalf of the nationwide classes, New York-California-Florida classes, and New York classes); (IV) violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.* (brought on behalf of California classes); (V) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* (brought on behalf of California classes); (VI) violations of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.* (brought on behalf of California classes); (VII) violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") § 501.201 *et seq.* (brought on behalf of Florida classes); (VIII) breach of express warranty under New York law (brought on behalf of the nationwide classes, New York-California-Florida classes, and New York classes); (IX) breach of express warranty under California law (brought

4

on behalf of California classes); (X) breach of express warranty under Florida law (brought on behalf of Florida classes); (XI) intentional misrepresentation under New York law (brought on behalf of the nationwide classes, New York-California-Florida classes, and New York classes); (XII) intentional misrepresentation under California law (brought on behalf of California classes); and (XIII) intentional misrepresentation under Florida law (brought on behalf of Florida classes).

In recent months, a number of follow-on suits had been filed in district courts around the country. Defendants moved before the Judicial Panel on Multidistrict Litigation to consolidate all of the actions. The JPML consolidated them before this Court in December 2012, and continues to add related cases to this multidistrict litigation. Defendants then filed this motion.

## STANDARD OF REVIEW

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the court to examine the legal, rather than factual, sufficiency of a complaint. As required by Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A court considering a 12(b)(6) motion must "take[] factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). A complaint need not contain "'detailed factual allegations,'" but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-

5

me accusation." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  In other words,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Rather, the plaintiff's

complaint must include "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570).  The

determination of whether "a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2d Cir. 2007)).


## DISCUSSION

### I.  Motion to Take Judicial Notice

In support of their motion to dismiss, defendants request that the Court take judicial

notice of twenty-three exhibits that are: various documents published by the Federal Trade

Commission ("FTC"), the Food and Drug Administration ("FDA"), and the United States

Department of Agriculture ("USDA"); reports published by industry and consumer groups; a

handful of federal and state statutes; a state regulation; and the contents of a state ballot initiative

along with its corresponding election results.  (*See* Defs.' Mot. to Take Judicial Notice (Doc. No.

26) at 2-4.)

A district court may consider matters of which judicial notice may be taken without

converting a motion to dismiss into one for summary judgment.  *Staehr v. Hartford Fin. Servs.

Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Courts may judicially notice facts that are "not

subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).[2]

Defendants request notice "of the fact that the respective agencies or industry groups published these reports to consumers." (Defs.' Mot. to Take Judicial Notice at 4.) Defendants ask for notice of these documents in order to provide context for their argument that "it would be objectively unreasonable for any consumer to view the inclusion of the word 'natural' on a product label as an implicit representation that the corn from which the product is made was grown without bioengineering technology." (*Id.* at 16-17.)

Plaintiffs oppose judicial notice of these documents on several grounds. At bottom, however, plaintiffs' arguments respond not to whether the Court should take notice of the documents, but rather whether the Court should draw from them the inferences and conclusions that defendants suggest in their motion to dismiss – *i.e.*, whether they demonstrate that no reasonable consumer would construe the label "All Natural" to mean free from GMOs. Whether to take judicial notice is an inquiry separate and distinct from what inferences or conclusions to draw from the noticed material. *See Staehr*, 547 F.3d at 426 (affirming district court's decision to take judicial notice of media reports, state court complaints, and regulatory filings, but

---

[2] Although the parties have briefed the judicial notice motion through the lens of Rule 201, the Court notes that it may not, in fact, apply here. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 812 (2d Cir. 1995) ("Rule 201 is frequently (albeit erroneously) cited in cases that involve judicial notice of legislative facts."). By its own terms, Rule 201 applies only to judicial notice of adjudicative facts, and not legislative facts. Fed. R. Evid. 201(a). "Adjudicative facts are simply the facts of the particular case." Fed. R. Evid. 201 advisory committee's note to subdivision (a). "Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." *Id.*; *see also Hernandez-Fundora*, 58 F.3d at 812 ("Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case.").

Here, the fact that the various materials were published and that they contain certain statements do not speak to "facts concerning the immediate parties – who did what, where, when, how, and with what motive or intent." Fed. R. Evid. 201 advisory committee's note to subdivision (a). Rather, these facts would remain constant from case to case, regardless of the identities and actions of the parties. Although this distinction is important – the indisputability requirement that operates to limit judicial notice of adjudicative facts under Rule 201 does not so operate with regard to notice of legislative facts, *see Hernandez-Fundora*, 58 F.3d at 812 – the Court finds that notice would be proper here regardless of whether these facts are characterized as adjudicative or legislative, but will evaluate the defendants' motion under Rule 201.

reversing its conclusion that noticed information was sufficient to rule, as matter of law, that investors were on inquiry notice of alleged fraudulent conduct).

Thus, the Court will take judicial notice of Exhibits A, B, E, F, G, K, L, and T, as they are noticeable as contents of the Federal Register and Code of Federal Regulations.  *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . "); 44 U.S.C. § 1510 (The Code of Federal Regulations is a "special or supplemental edition[] of the Federal Register," and is thus encompassed within § 1507).  Exhibits C, D, H, I, M, N, V, and W are noticeable as agency letters, policy and guidance documents, websites, and other agency data made available to the public outside of the Federal Register by administrative agencies.  *See, e.g.*, *Porazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) (taking notice of agency guidance documents, consumer advisory, backgrounder, and letters because they were available on FDA website); *In re Zypreza Prods. Liability Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Public documents issued by government agencies such as the Food and Drug Administration may also be" judicially noticed).  Exhibits J, R, and S are noticeable as reports published by industry or consumer organizations.  *See In re Bear Stearns Cos., Inc. Securities, Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (taking notice of journal and industry reports).  Exhibits O and P are noticeable as state laws and regulations. *See Newman v. Clayton F. Summy Co.*, 133 F.2d 465, 467 n.3 (2d Cir. 1942) ("[T]he federal court in any district takes judicial notice of the laws of all states."); *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (holding that district court properly took notice of state regulation). It is also proper to take judicial notice of Exhibit U as a federal statute.  *See United States v. Lamont*, 236 F.2d 312, 315 (2d Cir. 1956) (taking notice of a federal statute).  Finally, Exhibit Q is noticeable as the result of a general election.  *See Laffi v. Gonzalez*, 430 F.3d 103, 106 n.1 (2d

Cir. 2005) (taking judicial notice of election results).  Thus, the Court grants defendants' request

and takes notice of each of these documents for the fact that they contain the statements that they

contain and were publicly available, as defendants request.  *See Porrazzo*, 822 F. Supp. 2d at 412

("In the motion to dismiss context, a court should generally take judicial notice to determine

what statements the documents contain, not for the truth of the matters asserted.") (internal

quotation marks and citations omitted).

## II.  Motion to Dismiss

### A.  PepsiCo, Inc. as a Proper Defendant

Named as a defendant is PepsiCo, "the parent company of Frito-Lay."  (FAC ¶ 22.)

PepsiCo holds Frito-Lay as a wholly-owned subsidiary.  (*Id.*)  PepsiCo argues that it should be

dismissed from this suit because plaintiffs' allegations fail to show that PepsiCo should be held

liable for the acts of its subsidiary.  In response, plaintiffs contend that PepsiCo can be held

directly liable for its actions related to the labeling of the products at issue here.  They also argue

that they may pierce the corporate veil and hold PepsiCo liable for the acts of Frito-Lay as its

subsidiary.  The Court finds that as filed, the First Amended Complaint fails to allege sufficient

facts to support liability against PepsiCo.

#### 1.  *Direct Liability*

Plaintiffs contend that PepsiCo is directly liable for the claims they bring because

PepsiCo was "directly involved in the decisions to label and market" the chip and dip products as

"All Natural."  (Pls.' Opp'n at 34.)  As alleged in the First Amended Complaint, PepsiCo

"markets, advertises and distributes" the products.[3]  (FAC ¶ 22.)  PepsiCo "actively coordinates

its marketing and advertising activities with Defendant Frito-Lay to promote the products as 'all

natural.'"  (*Id.* ¶ 27.)  In September 2011, PepsiCo launched a marketing strategy to integrate its

---

[3] In contrast, Frito-Lay "manufactures, markets, advertises, distributes and sells" the products.  (FAC ¶ 24.)

various food and beverage businesses called the "Power of One – Americas Council," which "bring[s] together its top and food and beverage leaders to leverage the combined scale of the company's complementary snack and beverage businesses across North, South and Central America."  (*Id.* ¶¶ 28.)  The CEO of PepsiCo Americas Foods discussed Frito-Lay's decision to manufacture and sell all natural products at an industry conference.  (*Id.* ¶ 32.)

PepsiCo contends that these allegations do not give rise to direct liability because the First Amended Complaint does not allege that PepsiCo manufactures, sells, or labels the products.  (Defs.' Reply at 11.)  Indeed, none of the allegations against PepsiCo indicate that it had any role in the decision to label the products at issue here "All Natural."  Nor does the First Amended Complaint allege that PepsiCo manufactured the products.  *See Magnus v. Fortune Brands, Inc.*, 41 F. Supp. 2d 217, 224 (E.D.N.Y. 1999) (holding that plaintiffs failed to allege specific facts to establish parent companies' direct liability for failure-to-warn and strict liability claims because the parent companies did not manufacture the product at issue).

The Court further finds insufficient plaintiffs' allegations that PepsiCo "markets, advertises and distributes" the products as insufficient to establish direct liability.  The facts behind that allegation – the Power of One campaign – do not specifically relate to or discuss the marketing or labeling of the products as "All Natural."  Nor does the fact that a press release on PepsiCo's website announcing that Frito-Lay "said that approximately 50 percent of its product portfolio will be made with all natural ingredients" say anything as to PepsiCo's role, if any, in making that decision.  Frito-Lay is the speaker in the press release.  Finally, the CEO's statement that consumers want all natural products, and, as such, "we will take that all-natural look to every piece of . . . the stores, and all of our temporary displays will showcase and romance the all-natural look" does not give rise to direct liability because from the context of the statement, it

is clear that "we" means Frito-Lay, and "such representations may result from public relations motives or an attempt at simplification." *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 846 (D. Del. 1978).  This is likely even more true given that the statement was made at a Morgan Stanley global consumer and retail conference, where the CEO was talking about Frito-Lay's move to an all-natural product line.  *See* Transcript, PEP-PepsiCo at Morgan Stanley Consumer & Retail Conference, http://pepsico.com/download/pep-transcript-2010-11-17.pdf (last visited August 20, 2013) (incorporated by reference in FAC ¶ 32.)  Moreover, "the Court is not persuaded that a failure to distinguish between parent and subsidiary . . . is sufficient to show that the parent controls the subsidiary's marketing and operational policies." *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (motion to dismiss); *cf. Montalbano v. HSN, Inc.*, No. 11-CV-96, 2011 WL 3921398, at *4 (N.D. Ill. Sept. 6, 2011) (finding no personal jurisdiction over parent company based on website statements because it was clear that the statements on the website were "being used as a shorthand for all of the" parent's subsidiaries).

In sum, as pled, these allegations do not show that PepsiCo actively participated in the decision to label the products "All Natural."  All that these allegations show, rather, is that PepsiCo was acting as a parent company, who "necessarily exercise[s] a considerable degree of control over the subsidiary corporation." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984).  "[A]nd the discharge of that supervision alone" is not enough to give rise to direct liability.  *Id.*

2.  *Alter Ego Liability*

In order to pierce the corporate veil and hold PepsiCo liable for the acts of its subsidiary, under Delaware law[4] plaintiffs must show "that the controlling corporation wholly ignored separate status of [the] controlled corporation and so dominated and controlled its affairs that separate existence was a sham."  *Harrison v. NBD, Inc.*, 990 F. Supp. 179, 184 (E.D.N.Y. 1998) (citing *Culbreth v. Amosa Ltd.*, 898 F.2d 13, 14 (3d Cir. 1990)).  Additionally, the plaintiffs must show that "some 'fraud or injustice' would be perpetrated through misuse of the corporate form." *MicroStrategy Inc. v. Acacia Research Corp.*, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010); *see also Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (explaining that to pierce the corporate veil under Delaware law, a plaintiff must show that the parent and subsidiary operated as a single economic entity and that an overall element of injustice or unfairness is present).  "The fraud or injustice must consist of something more than the alleged wrong in the complaint and relate to a misuse of the corporate structure."  *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, Fr.*, No. 19760-NC, 2004 WL 5366102, at *7 (Del. Ch. Mar. 4, 2004).  When considering piercing the corporate veil, a court should look to "'(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder.'"  *MicrostrategyInc.*, 2010 WL 5550455, at

---

[4] Delaware law applies to this analysis.  A federal district court sitting in diversity generally applies the choice of law rules of the state in which it sits.  *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012).  Under New York's choice of law rules, the law of the state of incorporation determines whether piercing the corporate veil is warranted.  *Gabriel Capital. L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 433 (S.D.N.Y. 2000); *see also In re Alper Holdings USA, Inc.*, 398 B.R. 736, 757 (S.D.N.Y. 2008) ("Under New York choice of law principles, if both entities are incorporated in Delaware, Delaware law controls the alter ego analysis.").  PepsiCo and Frito-Lay are Delaware corporations.  (FAC ¶¶ 22, 24.)  Therefore, the Court applies Delaware law to determine whether the alter ego theory of liability is properly pled.

*11 (quoting *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184-VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008)).

Plaintiffs' allegations in support of its alter ego theory of liability do not show that PepsiCo and Frito-Lay operated as a single economic entity, that their separate existence was a sham, or that there was a misuse of the corporate form.  Plaintiffs allege that the Executive Vice President of PepsiCo is also the President of Frito-Lay.  (FAC ¶ 34.)  They also point to the "Power of One" campaign to show that PepsiCo and Frito-Lay are "inextricably intertwined" (Pls.' Opp'n at 35.)  Because "a plaintiff seeking to persuade a [] court to disregard the corporate structure faces a difficult task," *Fletcher*, 68 F.3d at 1458, the Court finds that these allegations are insufficient bases upon which to proceed against PepsiCo on an alter ego theory of liability. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (finding allegations that officer of parent company was also officer of subsidiary and that parent made statements about the business direction of the subsidiary as insufficient bases for piercing the corporate veil); *Fletcher*, 68 F.3d at 1460 ("[T]he fact that a parent and a subsidiary have common officers and directors does not necessarily demonstrate that the parent corporation dominates the activities of the subsidiary.")  Plaintiffs' allegations are also deficient because they fail entirely to plead what injustice or unfairness is present by the defendants' misuse of the corporate form.  *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 88 (S.D.N.Y. 2010) (finding allegations for piercing the corporate veil deficient because plaintiffs did not offer sufficient facts to show any injustice).  Thus, plaintiffs may not proceed against PepsiCo on an alter ego theory of liability, and, accordingly, all claims against PepsiCo are dismissed.

B.  Primary Jurisdiction

Frito-Lay submits that this entire litigation may be dismissed, or, in the alternative, stayed, pending a referral of the matter to the federal agency charged with regulating food labeling, the FDA, pursuant to the primary jurisdiction doctrine.  Plaintiffs, and the Court, disagree.

The primary jurisdiction doctrine is "relatively narrow" in scope.  *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 851 (2d Cir. 1988).  It is a cousin to an administrative exhaustion requirement, applicable when a "judicially cognizable claim is presented but 'enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'"  *Id.* (quoting *United States v. W. Pacific R.R.*, 352 U.S. 59, 64 (1956)).  The doctrine serves to ensure "'uniformity and consistency'" in regulating a particular industry and is applied when, "with respect to certain matters, 'the expert and specialized knowledge of the agencies' should be ascertained before judicial consideration of the legal claim."  *Goya Foods*, 846 F.2d at 851 (quoting *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303-04 (1976) and *W. Pacific R.R.*, 352 U.S. at 64).

The FDA has not promulgated any formal rule or policy explaining when a food may be labeled "natural."  In 1991, the FDA issued a notice of proposed rulemaking "to address the use of the term 'natural.'"  Food Labeling: Nutrient Content Claims, General Principles, Definition of Terms, 56 Fed. Reg. 60,421 (proposed Nov. 27, 1991) (Ex. K to Mot. to take Judicial Notice).  The agency issued a final rule in 1993, but explicitly declined to adopt a definition of the term "natural."  Food Labeling: Nutrient Content Claims, General Principles, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2407 (Final Rule Jan. 6, 1993) (Ex. L to Mot. to take Judicial Notice).  The agency

commented that, "because of resource limitations and other agency priorities, FDA is not undertaking rulemaking to establish a definition for 'natural' at this time." *Id.* Instead, the FDA stated it would "maintain its current policy . . . not to restrict the use of the term 'natural' except for added color, synthetic substances, and flavors" and would continue its informal policy to regard "natural" as "meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or been added to, a food that would not normally be expected to be in the food." *Id.* That continues to be FDA's informal policy with respect to the term "natural."

The FDA has also issued a statement of policy on labeling of foods "derived from new plant varieties developed by recombinant DNA techniques." Statement of Policy: Foods Derived From New Plant Varieties, 57 Fed. Reg. 22,984, 22, 991 (May 29, 1992) (Ex. T to Mot. to take Judicial Notice). There, the FDA stated that it believes new techniques to develop a new plant variety "are extensions at the molecular level of traditional [breeding] methods and will be used to achieve the same goals as pursued with traditional plant breeding." *Id.* Because the FDA does not believe that genetically modifying a plant variety "will present any different or greater safety concern than foods developed by traditional plant breeding," it concluded that such information "would not usually be required to be disclosed in labeling for the food." *Id.* In 2001, the FDA published additional guidance on labeling requirements for foods produced using bioengineering methods. In it, the agency reaffirmed its 1992 statement of policy and stated that it was not aware of any information indicating that foods produced with bioengineering techniques presented any safety concerns, and, therefore, it reaffirmed "its decision to not require special labeling of all bioengineered foods." U.S. Food & Drug Admin., Guidance for Industry Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using

Bioengineering, Draft Guidance, released Jan. 2001, *available at*

http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/Labe

lingNutrition/ucm059098.htm (last visited Aug. 5, 2013) (Ex. V to Mot. to take Judicial Notice).

FDA's current policy remains that labeling a food to indicate that it contains bioengineered

ingredients is voluntary.

     Against this regulatory backdrop, Frito-Lay's request to dismiss, or stay, this action for

the FDA to address whether foods containing bioengineered ingredients may be labeled "natural"

is unwarranted.  First, and foremost, the primary jurisdiction doctrine does not apply when "the

issue at stake is legal in nature and lies within the traditional realm of judicial competence."

*Goya Foods*, 846 F.2d at 851 (citing *Nader*, 426 U.S. at 304 and *Gen. Elec. Co. v. MV*

*NEDLLOYD*, 817 F.2d 1022, 1026 (2d Cir. 1987)).  "This case is far less about science than it is

about whether a label is misleading," and the reasonable-consumer inquiry upon which some of

the claims in this case depends is one to which courts are eminently well suited, even well

versed.  *Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 898 (N.D. Cal. 2012); *see also*

*Ackerman v. Coca-Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *14 (E.D.N.Y. July 21,

2010) ("The question whether defendants have violated FDA regulations and marketed a product

that could mislead a reasonable consumer is one courts are well-equipped to handle, and is not an

appropriate basis for invoking the primary jurisdiction doctrine."); *Lockwood v. ConAgra Foods,*

*Inc.*, 597 F. Supp. 2d 1028, 1035 (N.D. Cal. 2009) ("[E]very day courts decide whether conduct

is misleading.").  Moreover, even if the FDA were to formally define the term "natural," it

"would not dispose of plaintiffs' state law claims."  *Lockwood*, 597 F. Supp. 2d at 1035.  There

is no telling, if it even chose to respond with any directive to the Court's referral, how the FDA

would define the term, and whether its definition would shed any further light on whether a

reasonable consumer is deceived by the "All Natural" food label when it contains bioengineered ingredients.  Furthermore, numerous district courts have declined to invoke primary jurisdiction in state-law consumer protection cases so that the FDA may pass on whether a food may properly be labeled "natural."  *See, e.g.*, *Janney v. Mills*, --- F. Supp. 2d ----, No. 12-CV-3919, 2013 WL 1962360, at *3-7 (N.D. Cal. May 10, 2013) (declining primary jurisdiction where plaintiffs alleged foods containing high fructose corn syrup were not "all natural"); *Krzykwa v. Campbell Soup Co.*, No. 12-CV-62058, 2013 WL 2319330, at *4 (S.D. Fla. May 28, 2013) (declining primary jurisdiction where plaintiffs alleged foods containing genetically modified corn were not "all natural"); *Briseno v. ConAgra Foods, Inc.*, No. 11-CV-5379, 2011 U.S. Dist. LEXIS 154750, at *27-29 (same).  These reasons alone are sufficient to deny dismissal and a stay.

Frito-Lay points out that, in recent weeks, two district courts have agreed to stay cases involving labeling foods made with genetically modified corn as "natural" for six months pursuant to the primary jurisdiction doctrine.  (*See* Defs.' July 17, 22, 29, and August 7, 2013 Ltrs. (Doc. Nos. 32-35).)  This Court does not find persuasive the reasons for invoking primary jurisdiction in those cases; the issues of fact in this case are, in fact, "within the conventional experience of judges," Report & Recommendations, *Van Atta v. General Mills*, No. 12-CV-2815 (D. Colo. July 18, 2013) (Ex. A to Defs.' July 22, 2013 Ltr. at 7), and, undertaking the decision-making in this case would not "risk usurping the FDA's interpretive authority" or undermine its "considered judgments," July 11, 2013 Order, *Cox v. Gruma Corp.*, No. 12-CV-6502 (N.D. Cal. July 11, 2013) (Ex. 1 to Defs.' July 19, 2013 Ltr. at 3).

Moreover, the FDA is unlikely to respond in a timely manner to any referral from this Court.  In 2010, a district court referred a similar case to the FDA to determine whether high

fructose corn syrup was a natural ingredient.  The FDA responded that "in the absence of a pre-existing regulatory definition, the agency would expect to act in a transparent manner by engaging in a public proceeding to establish the meaning of this term."  Order Lifting Temporary Stay (Doc. No. 119) at 3, in *Coyle v. Hornell Brewing Co.*, No. 08-CV-2797 (D.N.J. Sept. 16, 2010).  "Given the issues involved," the FDA continued, "making such a determination without adequate public participation would raise questions about the fairness of FDA's action.  FDA's experience with such proceedings suggests that it would take two to three years to complete."  *Id.* Such a time frame, the FDA recognized, "would likely not be useful to the Court in resolving" the case before it.  *Id.*

Here too, the agency would need far more than six months to define the term "natural," or pass on whether foods containing bioengineered ingredients may be labeled as "natural," and would likely open that deliberation to public notice and comment.  In an analogous situation, the FDA took nine years to define the requirements a manufacturer must meet before it can label a food "gluten-free."  Brady Dennis, "Nine Years after Congress's Request, FDA defines 'Gluten-free,'" *Wash. Post*, Aug. 2, 2013, *available at* http://www.washingtonpost.com/national/health-science/9-years-after-congresss-request-fda-defines-gluten-free/2013/08/01/cfeb2c08-faef-11e2-a369-d1954abcb7e3_story.html (last visited Aug. 20, 2013).  This nine-year period was in the face of a mandate from Congress to define the term "gluten-free."  In the Food Allergen Labeling and Consumer Protection Act, enacted into law on August 2, 2004, Congress directed the FDA to issue a rule to define and permit use of the term "gluten-free."  Gluten-Free Labeling of Foods, 78 Fed. Reg. 47,154, 47,156 (Aug. 5, 2013) (to be codified at 21 C.F.R. pt. 101).  The agency published the final rule on August 5, 2013 in the Federal Register.  *Id.*  A similar deliberative, open, and considered process would likely be undertaken to address labeling of

18

foods containing genetically modified ingredients, and there is no reason to believe that the FDA

would abandon its deliberative process in order to respond to the Court's referral through a

hurried, ad hoc, and closed manner.  Should the FDA respond to the referrals in other similarly

situated cases with helpful guidance, the Court will still be able to entertain such guidance in this

litigation.

For all of these reasons, the Court will not dismiss, or stay, this case pursuant to the

primary jurisdiction doctrine.

C.  Preemption

Frito-Lay next contends that the entire case should be dismissed under obstacle

preemption principles.  The Court disagrees.

Obstacle preemption is a species of conflict preemption and applies where "local law is

an obstacle to the achievement of federal objectives."  *New York SMSA Ltd. P'ship v. Town of

Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79

(1990) (explaining that obstacle preemption applies where state law "stands as an obstacle to the

accomplishment and achievement of the full purposes and objectives of Congress").

Frito-Lay asks the Court to give preemptive effect to the FDA's non-binding guidance on

the meaning of the term "natural."  In turn, it argues, that plaintiffs' state-law claims stand as an

obstacle to the enforcement of the non-binding guidance.  But such non-binding guidance is not

entitled to preemptive effect.  *See Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 342 (3d Cir.

2009) ("We believe that neither the FDA policy statement regarding the use of the term 'natural'

nor the FDA's letter indicating that some forms of [high fructose corn syrup] may be classified

as 'natural' have the force of law required to preempt conflicting state law" and rejecting

obstacle preemption argument).  Even if that non-binding guidance would be entitled to

preemptive effect,[5] that policy contains "no actual federal requirements regarding the term 'natural' for the Court to endow with preemptive effect." *Barnes v. Campbell Soup Co.*, No. 12-CV-5185, Order (Doc. No. 55) at 13 (N.D. Cal. July 25, 2013). Moreover, in several recent cases, district courts have rejected preemption arguments premised upon the FDA's non-binding guidance on the meaning of the term "natural." *See Lockwood*, 597 F. Supp. 2d at 1034 (conflict preemption); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-CV-4387, 2011 WL 2111796, at *8 (N.D. Cal. May 26, 2011) (express and implied preemption); *Hitt v. Ariz. Beverage Co., LLC*, No. 08-CV-809, 2009 WL 449190, at *2-5 (S.D. Cal. Nov. 24, 2009) (express and implied preemption). As such, the First Amended Complaint will not be dismissed on the basis of obstacle preemption.

    D. <u>Standing</u>

    Frito-Lay's next argument directed at the First Amended Complaint as a whole relates to standing. Frito-Lay contends that plaintiffs do not have standing to bring claims related to the "All Natural" labeling of eight products that none of the named plaintiffs purchased.[6] In opposition, plaintiffs maintain that the question of whether they can pursue claims related to products they did not purchase is not a question of Article III standing, but instead a question of "class standing," and should be considered not on a Rule 12 motion to dismiss, but instead on a motion for class certification pursuant to Rule 23. While the difference between Article III

---

[5] Frito-Lay cites to one case from the Court of Appeals for the Ninth Circuit, *Degelmann v. Advanced Medical Optics, Inc.*, 659 F. 3d 835, 841-42 (9th Cir. 2011), where the court gave preemptive effect to policy guidance. However, the *Degelmann* opinion on which Frito-Lay relies has been vacated. *See Degelmann v. Advanced Med. Optics, Inc.*, 699 F.3d 1103, 1104 (9th Cir. 2012). This Court will not rely upon a vacated opinion, as "vacatur does have the effect, in a concrete and practical way, of removing them from the reservoir of legal thought upon which the bench and bar can subsequently draw." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 547 F.3d 109, 112 n.5 (2d Cir. 2008).

[6] Those eight products are (1) Tostitos Bite Size Rounds Tortilla Chips; (2) Tostitos Restaurant Style with a Hint of Jalapeno Flavored Tortilla Chips; (3) Tostitos Restaurant Style with a Hint of Pepper Jack Flavored Tortilla Chips; (4) Tostitos Artisan Recipes Bakes Three Cheese Queso Flavored Tortilla Chips; (5) Tostitos Artisan Recipes Roasted Garlic and Black Bean Flavored Tortilla Chips; (6) Tostitos Artisan Recipes Toasted Southwestern Spices Flavored Tortilla Chips; (7) SunChips Jalapeno Jack Flavored Multigrain Snacks; and (8) Fritos Hot Bean Dip. (FAC ¶¶ 3, 17-20.)

standing and class standing "'looks straightforward and one would expect it to be well settled[,] neither assumption is entirely true.'" *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 160 (2d Cir. 2012) (quoting *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768 (1st Cir. 2011)).  Despite conflicting authority, which is discussed more fully below, on the question of whether plaintiffs would have Article III standing to pursue claims arising from putative class members' purchases of products that plaintiffs themselves did not purchase, the Court concludes, in accord with the Second Circuit's decision in *NECA-IBEW*, that the question is one of class standing.

"To satisfy the irreducible constitutional minimum of [Article III] standing, a plaintiff must demonstrate (1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely redress." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (citations and internal quotation marks omitted).  "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Id.* (citations and internal quotation marks omitted).  These rules are no less true for plaintiffs representing putative classes.  "'That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Id.* at 64 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citations, internal quotation marks, and alterations omitted)).

There is no doubt that plaintiffs have alleged sufficient facts to show that they, individually, have Article III standing.  Nor does Frito-Lay dispute that plaintiffs, as individuals, have Article III standing.  Plaintiffs all purchased certain Tostitos, SunChips, and Bean Dip

products.  They were injured as a result of those purchases because they paid higher prices than

they would have otherwise paid, or not paid at all, for a product that they contend is not, in fact,

all natural.  *See, e.g.*, *Quinn v. Walgreen Co.*, --- F. Supp. 2d ----, No. 12-CV-8187, 2013 WL

4007568, at *6 (S.D.N.Y. Aug. 7, 2013) ("There is no question plaintiffs have standing to assert

claims relating to the product they *did* purchase.") (emphasis in original).

The relevant question thus becomes whether plaintiffs can represent putative class

members who suffered a similar injury arising out of the class members' purchases of products

that the plaintiffs did not purchase.  It remains undisputed that plaintiffs lack Article III standing

to assert claims arising out of products that they themselves did not purchase.  *See NECA-IBEW*,

693 F.3d at 158 ("NECA clearly lacks standing to assert such claims on its behalf because it did

not purchase those Certificates.").  But, once there is at least one named plaintiff for every

named defendant "who can assert a claim directly against that defendant, . . . [Article III]

standing is satisfied and only then will the inquiry shift to a class action analysis."  *Cent. States*

*Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229,

241 (2d Cir. 2007).

*NECA-IBEW* illustrates how this inquiry operates.  There, the Second Circuit held that

the plaintiff, a health and welfare fund, did have standing to assert class claims with respect to

certain securities offerings by the defendants that the plaintiff did not itself purchase.  The court

reinforced that standing to assert claims on behalf of other purchasers did not turn on whether the

plaintiff had Article III standing for the offerings it did not purchase.  693 F.3d at 158.  That

inquiry, the court reasoned, turned on whether the plaintiff had "'class standing'—that is,

standing to assert claims on behalf of purchasers of Certificates from other Offerings."  *Id.*  In

other words, once the plaintiff satisfied the Article III (and statutory)[7] standing requirements, the inquiry shifted "from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.'" *Id.* at 159 (quoting *Sosna v. Iowa*, 419 U.S. 393, 403 (1975) and Fed. R. Civ. P. 23(a)).

The Second Circuit went on to discuss the seemingly inconsistent case law from the Supreme Court that speaks to the "'tension' . . . as to whether 'variation' between (1) a named plaintiff's claims and (2) the claims of putative class members 'is a matter of Article III standing . . . or whether it goes to the propriety of class certification pursuant to'" Rule 23.  *NECA-IBEW*, 693 F.3d at 160 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 263 & n.15 (2003)).  But from these cases, the Second Circuit distilled the broad principle that "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,'" thus satisfying Article III standing requirements, "and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *NECA-IBEW*, 693 F.3d at 162 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) and *Gratz*, 539 U.S. at 267, respectively).  As a result, the court held that the district court erred in requiring the plaintiff to allege an injury identical to that of the putative class members. *NECA-IBEW*, 693 F.3d at 162.

*NECA-IBEW* thus instructs that, because plaintiffs have satisfied the Article III standing inquiry, their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion.  *See Quinn*, 2013 WL 4007568, at *6 (holding that the time to consider whether plaintiffs can bring claims on behalf of all purchasers is at the class certification stage); *Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984,

---

[7] Frito-Lay makes no argument about plaintiffs' statutory standing.

991-92 (E.D. Cal. 2012) (finding whether plaintiff can pursue claims for putative class members arising out of products the plaintiff did not purchase to be a question of Rule 23, not Article III); *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 922 (N.D. Cal. 2012) (same); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1161-62 (C.D. Cal. 2012) (same).  Thus, the Court leaves that determination for another day, and nothing herein should be construed to suggest how plaintiffs will fare.

The cases upon which Frito-Lay relies discuss this question in terms of Article III standing, not class standing.  They admittedly conflict with *NECA-IBEW*, but are district court cases from outside of this Circuit and not binding on this Court.  *See, e.g.*, *Carrera v. Dreyer's Grand Ice Cream, Inc.*, No. 10-CV-1044, 2011 WL 159380, at *3 (N.D. Cal. Jan. 10, 2011) (dismissing claims for lack of standing to the extent they were predicated on products not purchased by named plaintiffs in putative class action); *Larsen v. Trader Joe's Co.*, No. 11-CV-5188, 2012 WL 5458396, at *4-5 (N.D. Cal. June 14, 2012) (same); *Granfield v. NVIDIA Corp.*, No. 11-CV-5403, 2012 WL 2847575, at *6 (N.D. Cal. July 11, 2012) (same).  Even if the inquiry here is one of Article III standing, there are cases conferring Article III standing to pursue claims on behalf of purchasers of products the named plaintiffs did not purchase so long as the products are "sufficiently similar" to those the plaintiffs did purchase.  *See, e.g.*, *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 889-91 (N.D. Cal. 2012); *Anderson v. Jamba Juice Co.*, 888 F. Supp. 2d 1000, 1006 (N.D. Cal. 2012).  And even these cases suggest that the question is truly one of class standing.  *See Brown*, 913 F. Supp. 2d at 891-92 (agreeing with plaintiff that the "standing" question is best addressed on a motion for class certification); *Anderson*, 888 F. Supp. 2d at 1006 ("If there is a sufficient similarity between the products, any concerns regarding material differences in the products can be addressed at the class certification stage.").

In sum, because the plaintiffs have Article III standing, at this stage, they may press

claims, on behalf of putative class members, arising out of products that the plaintiffs did not

themselves purchase.  Whether the plaintiffs' injuries are sufficiently similar to those of the

putative class members who purchased other products – and whether plaintiffs will therefore

adequately represent the interests of the class – is a question the Court will consider on a Rule 23

certification motion.

E.   The Reasonable Consumer

Frito-Lay's last, and principal, argument directed at the First Amended Complaint in its

entirety is that no reasonable consumer would view the "All Natural" label and understand it to

contain an "implicit representation that its products contain only corn grown without

bioengineering technology."  (Defs.' Br. at 17.)  In other words, no reasonable consumer would

believe that a product labeled "All Natural" is GMO-free.[8]

To support this argument, Frito-Lay relies upon information contained in various

materials – of which the Court takes judicial notice – that, it argues, demonstrates that a

reasonable consumer would understand the label "All Natural" to mean that no unexpected

artificial or synthetic ingredients have been added to a food after harvest.  (*Id.*)  These materials,

moreover, show that three federal agencies, states, and industry and consumer groups all agree

that "natural" does not mean GMO-free.  In Frito-Lay's view, it would thus be "objectively

unreasonable for any consumer to view the inclusion of the word 'natural' on a product label as

an implicit representation that the corn from which the product is made" is GMO-free.  (*Id.*)  A

reasonable consumer would understand the label's meaning even more because that consumer

---

[8] Frito-Lay states that all of plaintiffs' claims rely in some way on a reasonableness inquiry – either whether a reasonable consumer would be misled by the defendants' conduct or whether a consumer would reasonably rely upon certain warranties or representations.  Plaintiffs do not dispute this statement of the law.  For purposes of this motion, the Court will accept it as correct.

would understand the term "organic" to address how the food was grown and produced – that is, without genetically modified seeds, plants, or the like.  (*Id.*)  Plaintiffs of course disagree, and argue that what a reasonable consumer would understand "All Natural" to mean is a question of fact that cannot be resolved on a motion to dismiss.  The Court first discusses the judicially noticed materials, and then reaches the merits of this argument, concluding that what a reasonable consumer would believe raises a factual dispute that cannot properly be resolved on a motion to dismiss.

### 1. *Judicially Noticed Materials*

The range of information contained in the materials of which the Court takes judicial notice need not be recounted extensively.  The materials from the FDA have been discussed above and show that the FDA has promulgated non-binding guidance on the term "natural" as used in food labeling.  Worth highlighting here is the FDA's acknowledgement, in the notice of proposed rulemaking, that "'natural' claims are confusing and misleading to consumers and frequently breach the public's legitimate expectations about their meaning.'"  56 Fed. Reg. at 60,466 (Ex. K to Mot. to Take Judicial Notice.)  There is, in the FDA's view, a "general lack of consumer understanding and scientific agreement about the meaning of the term."  (*Id.*)

The FTC studied the term's use in 1974 and issued a notice of proposed rulemaking, but then terminated that rulemaking in 1983.  (*See* Exs. A & B to Mot. to Take Judicial Notice.)  In the notice of proposed rulemaking, the FTC commented that it was "seriously concerned with the ability of consumers to understand these terms" "natural" and "organic," "which are used in a wide variety of confusing and conflicting contexts."  39 Fed. Reg. 39,849.  But, "for example, a food product might be appropriately advertised as 'natural' only if it does not contain any artificial or synthetic ingredients."  (*Id.*)  The USDA has promulgated regulations on the use of

the term "organic" in food labeling.  Products that may not be labeled organic are those produced using "methods . . . to genetically modify organisms or influence their growth and development by means that are not possible under natural processes."  7 C.F.R. § 205.2 (Ex. F to Mot. to Take Judicial Notice.)  The USDA's website directs viewers to a Food Marketing Institute publication. (Ex. I to Mot. to Take Judicial Notice.)  The Food Marketing Institute publication, in turn, states that "natural" labeling is not regulated except for meat and poultry, and "most foods labeled natural are not subject to government controls beyond the regulations and health codes that apply to all foods."  But, the term "natural" does apply "broadly to foods that are minimally processed and free of synthetic preservatives; artificial sweeteners, colors, flavors and other artificial additives."  (Ex. J to Mot. to Take Judicial Notice.)  "'Organic' refers not only to the food itself, but also as to how it was produced" and organic "crops must be grown without using . . . bioengineered genes."  (*Id.*)

Frito-Lay also highlights state law regarding "natural" labeling.  The Code of Massachusetts Regulations states that "natural food" means "food which in its processing has not been treated with preservatives, antibiotics, synthetic additives, artificial flavoring, artificial coloring, or has been processed in such a manner so that it become[s] significantly less nutritive."  105 Mass. Code Reg. § 520.116 (Ex. O to Mot. to Take Judicial Notice.)  California's laws regarding organic products do not apply to the term "natural."  Cal. Health & Safety Code § 110885 (Ex. P to Mot. to Take Judicial Notice.)  California voters also rejected a ballot initiative in November 2012 that would have prohibited the use of the term "natural" on foods containing genetically modified ingredients.  (Ex. Q to Mot. to Take Judicial Notice.)

Finally, Frito-Lay points to the Food Marketing Institute publication, discussed above, as evidence that industry and consumer groups do not understand "natural" to mean GMO-free.  It

also points to a publication from the Organic Trade Association that states "natural" does not

mean the same as "organic" because the former has nothing to do with production processes.

(*See* Ex. R to Mot. to Take Judicial Notice.)  That publication goes on to state, "While an organic

product may also be considered natural, this is not necessarily the case."  (*Id.*)  The Center for

Science in the Public Interest published a document telling its readers that the best way to avoid

GMO food is to buy organic.  (Ex. S to Mot. to Take Judicial Notice.)

       2.  *Application of the Reasonable Consumer Standard*

What a reasonable consumer would believe the term "natural" to mean on a food label

cannot be resolved on this motion.  The materials discussed above demonstrate this conclusion.

The FDA has acknowledged that the term's use is confusing to consumers.  That "organic"

means GMO-free says nothing about whether a reasonable consumer would understand the term

"natural" to mean the same.  Nor can the Court conclude that a reasonable consumer, or any

consumer, is aware of and understands the various federal agencies' views on the term "natural."

None of them, by the way, state explicitly that foods containing GMO ingredients may be

labeled "natural."   The inferences Frito-Lay asks the Court to draw are too many and doing so –

in its favor – is inappropriate on a motion to dismiss.

"[T]he question whether a reasonable consumer would likely be deceived by the

designation 'All Natural' is a factual dispute."  *Vicuna v. Alexia Foods, Inc.*, No. 11-CV-6119,

2012 WL 1497507, at *2 (N.D. Cal. Apr. 27, 2012).  Therefore, it is generally not resolved on a

motion to dismiss.  *Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 899 (N.D. Cal. 2012);

*see also Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  Thus, the court in

*In re Conagra Foods Inc.*, 908 F. Supp. 2d 1090 (C.D. Cal. 2012) could not rule, as a matter of

law, that no reasonable consumer would be misled into believing that oil, which was labeled

"100% Natural," was free from genetically modified ingredients.  Similarly, the court in
*Ackerman* could not determine, as a matter of law, that no reasonable consumer would be misled
into believing that the beverage "vitaminwater" contained only vitamins and water and that it
was a "product that may help maintain healthy dietary practices."  2010 WL 2925955, at *15.
There, the court pointed out that the FDA recognized that the product names such as
vitaminwater could be misleading.  *Id.*  The same recognition appears in this case; FDA has
stated "natural" is a confusing and misleading term.

Discussing cases where a court did conclude, as a matter of law, that no reasonable
consumer would be deceived by a product's labeling better demonstrates why this case cannot be
so decided.  In *Sugawara v. Pepsico, Inc.*, No. 08-CV-1335, 2009 WL 1439115, at *1 (E.D. Cal.
May 21, 2009), plaintiffs alleged that defendants' labeling of "Cap'n Crunch with
Crunchberries" cereal deceived customers into believing it contained fruit because the product's
name included the word "berries" and its packaging displayed its "namesake, 'Cap'n Crunch,'
"thrusting a spoonful of 'Crunchberries' at the prospective buyer.  The "crunchberries" were
"pieces of cereal in bright fruit colors, shaped to resemble berries"; though closer inspection of
the packaging revealed that they were not, in fact, berries.  *Id.*  In holding that no reasonable
consumer would be deceived into believing the product contained fruit, the court reasoned that
no reasonable person, nor the plaintiff, had knowledge of or alleged the existence of any real
fruit known as a "crunchberry."  *Id.* at *3.  The label also explained that the product was a
"sweetened corn & oat cereal."  *Id.*  Additionally, the label explained that the picture of the
"crunchberries" – showing "round, crunch, brightly-colored cereal balls" – was enlarged to show
texture.  *Id.*

The court in *Videtto v. Kellogg USA*, No. 08-CV-1324, 2009 WL 1439086, at *3 (E.D. Cal. May 21, 2009) relied on similar representations on a cereal's packaging when determining that, as a matter of law, no reasonable consumer would believe that "Froot Loops" cereal contained real fruit. The packaging featured a toucan, a bowl of "multi-colored ring-shaped cereal, a small banner stating 'natural fruit flavors' that includes small vignettes of fruit next to it, and the phrase 'sweetened multi-grain cereal.'" *Id.*

*Sugawara* and *Videtto* border on fantasy, yielding dismissal as a matter of law. No reasonable consumer could view the Cap'n Crunch with Crunchberries and Froot Loops boxes and conclude that these products contain fruit, and then check the ingredients list to confirm this belief. In marked contrast, a reasonable consumer viewing the Tostitos, SunChips, and Bean Dip "All Natural" labels could reach a variety of conclusions about their potential for containing genetically modified ingredients. *See Williams*, 552 F.3d at 939-40 ("[R]easonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging."). The Tostitos, SunChips, and Bean Dips ingredients labels list corn and corn derivatives among their ingredients, but do not specify whether it is genetically modified. (*See* FAC at 20-22.) In short, the reasonable consumer inquiry is, in most instances, a factual one. Only in cases outside the heartland have courts rejected these kinds of claims on a motion to dismiss. This case is not one of those cases.

Frito-Lay attempts to compare the facts of this case to those in *Cardona v. Target Corp.*, No. 12-CV-1148, 2013 WL 1181963 (C.D. Cal. Mar. 20, 2013). The exercise is wanting. There, the court dismissed claims arising out of the defendant's labeling of honey as "pure" when, according to the plaintiff, "pure honey" would not have had pollen removed, and defendants removed pollen from their honey. The court, in an alternative holding, reasoned that "pure"

labeling can be misleading only to the extent it connotes the addition of other ingredients to a

product.  There, no ingredients were added; only taken away.  *Id.* at *13.  From this alternative

holding, Frito-Lay argues that, just as "pure" relates to what is added to a food after harvesting,

so does "natural."  The *Cardona* court makes no such comparison itself, and this Court will not

draw from that case an inference that a reasonable consumer would understand "natural" to mean

only what is added to a food after harvesting.

Frito-Lay is correct that, in resolving the reasonable consumer inquiry, one must consider

the entire context of the label.  *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)

(considering both large and small print in ad in dismissing consumer protection claims); *Verzani*

*v. Costco Wholesale Corp.*, No. 09-CV-2117, 2010 WL 3911499, at *2 (S.D.N.Y. Sept. 28,

2010) (considering entire label on a food tray, which listed each item on the tray and its relative

weight, in dismissing case alleging that the food tray's "net weight" label referred only to one

item in the tray, not all of the items on the tray); *Hairston v. S. Beach Beverage Co., Inc.*, No. 12-

CV-1429, 2012 WL 1893818, at *4 (C.D. Cal. May 18, 2012) ("Plaintiff's selective

interpretation of individual words or phrases from a product's labeling cannot support a CLRA,

FAL, or UCL claim.").  Here, the label on the Tostitos and SunChips products includes an

explanatory ring surrounding the "Made with ALL NATURAL ingredients" center.  That ring

states, "No MSG – No Preservatives – No Artificial Flavors."  Indeed, these additional

representations give context to the label's center pronouncement.[9]  But to hold as a matter of law

that they show no reasonable consumer would be deceived into believing the product is GMO-

free is not a conclusion the Court can reach at this stage.  Just as the court in *Ackerman* reasoned

that the information contained on vitaminwater's ingredients label – listing ingredients other than

---

[9] The Bean Dip products at issue here do not contain an explanatory ring.  As such, this argument does not apply to those products.

vitamins and water and indicating the sugar content of the beverage – "though relevant, does not

as a matter of law extinguish the possibility that reasonable consumers could be misled by

vitaminwater's labeling and marketing," this Court cannot conclude, as a matter of law, that the

added context to the "All Natural" label meets the heavy burden of "extinguish[ing] the

possibility" that a reasonable consumer could be misled into believing the products were GMO-

free.  2010 WL 2925955, at *16.  For these reasons, the reasonable consumer inquiry provides no

basis for dismissal of the First Amended Complaint.

The Court will now turn to Frito-Lay's arguments directed at specific claims pled in the

First Amended Complaint.

F.  <u>Magnuson-Moss Warranty Act Claim</u>

Plaintiffs, in Count I and on behalf of the nationwide class, allege that defendants

violated the Magnuson-Moss Warranty Act (MMWA).  "The MMWA grants relief to a

consumer 'who is damaged by the failure of a . . . warrantor . . . to comply with any obligation . .

. under a written warranty.'"  *Wilbur v. Toyota Motor Sales, U.S.A., Inc.*, 86 F.3d 23, 26 (2d Cir.

1996) (quoting 15 U.S.C. § 2310(d)(1)).  A written warranty is defined as

> any written affirmation of fact or written promise made in connection with
> the sale of a consumer product by a supplier to a buyer which relates to the
> nature of the material or workmanship and affirms or promises that such
> material or workmanship is defect free or will meet a specified level of
> performance over a specified period of time.

15 U.S.C. § 2301(6)(A).

Defendants argue that the MMWA claim must be dismissed because the "All Natural"

label on the various chip and dip products does not constitute a written warranty as defined by

the MMWA.  The Court agrees.  An "All Natural" label does not warrant a product free from

defect.  *Wilson v. Frito-Lay N. Am., Inc.*, No. 12-CV-1586, 2013 WL 1320468, at *15 (N.D. Cal.

Apr. 1, 2013); *see also Jones*, 912 F. Supp. 2d at 903-04 (N.D. Cal. 2012) (same).  Nor does it constitute a promise that the product 'will meet a specified level of performance over a specified period of time.'"  *Wilson*, 2013 WL 1320468, at *15 (quoting § 2301(6)(A)); *see also In re ConAgra Foods, Inc.*, 908 F. Supp. 2d at 1102 (holding that a "100% Natural" label is not an assertion that a product is defect free or will meet a specified level of performance over time).  Such labels are, "at most, product descriptions."  *Wilson*, 2013 WL 1320468, at *15; *see also Kane v. Chobani, Inc.*, No. 12-CV-2425, 2013 WL 3703981, at *19 (N.D. Cal. July 12, 2013) (holding that a food label is a product description and does not constitute a warranty against a product defect).  As such, the MMWA claim (Count I) is dismissed.

G.  New York Claims as to Non-New York Plaintiffs

Plaintiffs bring various claims under New York law on behalf of the plaintiffs who are citizens of Florida and California, and on behalf of putative class members who are not citizens of New York.  Frito-Lay contends that these claims must be dismissed because (1) New York's GBL §§ 349 and 350 (Counts II and III) do not apply to transactions occurring outside New York state and (2) because choice of law rules preclude the Court from applying the plaintiffs' New York breach of warranty and intentional misrepresentation claims (Counts VIII and XI) to non-New York plaintiffs and class members.  Frito-Lay is correct.  The Court addresses each set of claims in turn.

1.  *GBL Claims*

Sections 349 and 350 of the GBL, by their terms, apply only to transactions occurring in New York State.  *See Szymczak v. Nissan N. Am., Inc.*, No. 10-CV-7493, 2011 WL 7095432, at *12 (S.D.N.Y. Dec. 16, 2011) (holding that GBL §§ 349 and 350 "do not apply to transactions occurring outside the state.").  Section 349(a) declares unlawful "deceptive acts or practices in

the conduct of any business, trade or commerce or in the furnishing of any service in this state,"
and § 350 proscribes the same as to "false advertising."  The New York Court of Appeals has
held that the modifying language "in this state" "unambiguously evinces a legislative intent to
address commercial misconduct occurring within New York." *Goshen v. Mut. Life Ins. Co.*, 98
N.Y.2d 314, 324-25 (2002).  It modifies the entire phrase "conduct of any business, trade or
commerce or the furnishing of any service." *Id.*  Stated plainly, "to qualify as a prohibited act
under the statute, the deception of a consumer must occur in New York." *Id.*  Based on the Court
of Appeals' holding in *Goshen*, the district court in *Szymczak* dismissed claims under the GBL as
to plaintiffs who did not reside in New York or did not purchase their vehicles – the transactions
at issue in that case – in New York.  2011 WL 7095432, at *13.

Plaintiffs contend that whether they can maintain claims under the GBL is a question for
a class certification motion, not a motion to dismiss.  Plaintiffs do not cite any cases to support
this proposition.  In any event, courts have recognized that this question is usually addressed on a
class certification motion, but nevertheless decided it on a motion to dismiss. *See id.* at *12
(citing *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 (3d Cir. 2010)
(unpublished)).  The *Szymczak* court decided the issue on a motion to dismiss.  This Court will,
as well.

Plaintiffs also point to *Shady Grove Orthopedic Association, P.A. v. Allstate Insurance
Co.*, 130 S. Ct. 1431, 1437 (2010), and argue that, because Rule 23 would permit them to bring
claims under the GBL on behalf of a nationwide class, this Court must set aside New York's
substantive law holding that the GBL does not apply to conduct occurring outside New York.
This argument evinces a confused reading of *Shady Grove*.  In *Shady Grove*, the Supreme Court
considered whether a class action that met the requirements of Rule 23 could be maintained in

federal court, when a provision of New York law prohibited class actions in suits seeking penalties or statutory minimum damages, as the suit in question did. *Id.* at 1437. The provision of New York state law at issue in *Shady Grove* was a procedural, not substantive, rule – like Rule 23, a "precondition[] for maintaining a class action." *Id.* at 1438. As such, Rule 23's procedural requirements, not those set forth in New York law, applied in federal court sitting in diversity. *Id.* at 1442-43.

*Shady Grove* is wholly distinguishable because the law at issue here – that claims under the GBL may not be brought for transactions occurring outside New York – is substantive, not procedural. As the Court of Appeals held, sections 349 and 350 only apply to prohibited acts when "the deception of a consumer . . . occur[s] in New York." *Goshen*, 98 N.Y.2d at 325. Similarly, the court in *Leonard v. Abbott Laboratories, Inc.* held that a provision of Ohio state law was substantive and not procedural in applying *Shady Grove* when the state law was not a "'generally applicable procedural rule'" that applied broadly, even to federal claims or claims based on other states' laws, but instead was contained in the very statute creating the substantive right. No. 10-CV-4676, 2012 WL 764199, at *13 (quoting *In re Digital Music Antitrust Litig.*, No. 06-MD-1780, 2012 WL 2848195, at *18 (S.D.N.Y. July 18, 2011)). In *Leonard*, at issue was a restriction in the Ohio Consumer Sales Practices Act as to when a claim thereunder may be brought in a class action. 2012 WL 764199, at *11. The state rule at issue in *Leonard* appears infinitely more "procedural" than the rule with which plaintiffs take issue here, but was nevertheless not supplanted by Rule 23. Here, the state rule defines the very conduct prohibited by the GBL – solely conduct that occurs in New York. Simply put, there is nothing procedural about this rule.

As such, to the extent Counts II and III are brought by and on behalf of non-New York plaintiffs and putative class members, they are dismissed.

   2.   *Breach of Warranty and Intentional Misrepresentation*

Frito-Lay also argues that the plaintiffs' New York breach of warranty and intentional misrepresentation claims must be dismissed as to non-New York plaintiffs and putative class members under New York choice of law principles.  Plaintiffs do not offer an argument in opposition.

A federal district court sitting in diversity generally applies the choice of law rules of the state in which it sits.  *In re Coudert Bros.*, 673 F.3d at 186.  In contract cases, such as where a breach of warranty is alleged, New York courts apply a "center of gravity" or "grouping of contracts" approach.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (citations omitted).  "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter [of the contract], and the domicile or place of business of the contracting parties."  *Id.* (citations omitted).  "The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis."  *Id.*  Plaintiffs Gengo and Zuro purchased the products in California, while plaintiff Summerlin purchased the products in Florida.  (FAC ¶¶ 18-20.)  These states would be the places of contracting and performance.  These states are also where these plaintiffs are domiciled.  As such, California and Florida law should govern their breach of warranty claims, and thus the breach of warranty claim (Count VIII) arising under New York law must be dismissed as to non-New York plaintiffs and putative class members.  *See Cohen v. Implant Innovations, Inc.*, 259

F.R.D. 617, 625 (S.D. Fla. 2008) (holding that the law of the state of each plaintiff and putative

class member should apply to a breach of express warranty claim).

Under New York choice of law principles, claims sounding in fraud, including claims of

intentional misrepresentation, are governed by the law of "the state in which the injury is deemed

to have occurred, which is usually where the plaintiff is located." *Nat'l W. Life. Ins. Co. v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 288 (2d Cir. 2004) (summary

order) (citing *Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973)). For plaintiffs Gengo and Zuro, the

injury would have occurred where they purchased the products, in California. For plaintiff

Summerlin, the situs of injury would be Florida. California and Florida law should govern their

intentional misrepresentation claims, and as such, the intentional misrepresentation claim arising

under New York law (Count XI) must be dismissed as to non-New York plaintiffs and putative

class members.

H. Safe Harbors

Next, Frito-Lay contends that plaintiffs' Florida Deceptive and Unfair Trade Practices

Act (FDUTPA) and GBL claims (Counts II, III and VII) must be dismissed under statutory safe

harbors because defendants' conduct is permitted by federal law – that is, it complies with the

FDA's voluntary labeling guidelines for the term "natural." Likewise, Frito-Lay asserts that the

plaintiffs' Unfair Competition Law (UCL), False Advertising Law (FAL), and Consumer Legal

Remedies Act (CLRA) claims (Counts IV, V and VI) must be dismissed under a common law

safe harbor because, as to all of these claims, a specific provision of California law authorizes

them to label the products at issue here as "All Natural." In response, plaintiffs contend that

Frito-Lay overstates the extent of protection offered by these safe harbors and that the alleged

conduct at issue here does not meet the very narrow and specific protection they offer. The

Court addresses in turn each of the safe harbor provisions, and finds that none provide Frito-Lay with protection.

1. *Florida*

Fla. Stat. § 501.212(1) provides that the FDUTPA does not apply to "an act or practice required or specifically permitted by federal or state law."  There is no question that defendants' conduct is not required by federal law; the issue is whether it is "specifically permitted" by federal law, i.e., the FDA's voluntary "natural" labeling guidelines.

Courts have construed § 501.212(1) narrowly.  A party seeking its protection must demonstrate "that a specific federal or state law affirmatively authorized it to engage in the conduct" of which plaintiffs complain.  *State of Fla., Office of Atty. Gen., Dep't of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005); *see also Peters v. Keyes Co.*, No. 10-CV-60162, 2010 WL 1645095, at *4 (S.D. Fla. Apr. 21, 2010) *aff'd sub nom. Peters v. The Keyes Co.*, 402 F. App'x 448 (11th Cir. 2010).  Here, it is not clear that FDA's voluntary guidelines on "natural" labeling would constitute a specific federal law that would trigger § 501.212(1).  *See In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litigation*, --- F. Supp. 2d ----, No. 12-MD-2324, 2013 WL 3830124, at *25 (S.D. Fla. July 24, 2013) (statements made by the FDA in a letter to a defendant were "insufficient to accord . . . the weight of federal law to invoke the safe harbor").

Additionally, the parties vigorously dispute whether genetically modified corn could satisfy FDA's guidance on what "natural" means.  As plaintiffs argue, it could be a "synthetic" ingredient, as that term is used in the FDA's guidance, that "would not normally be expected to be in" Frito-Lay's products.  (Ex. L to Mot. to take Judicial Notice at 2407).  The fact that FDA's guidance on "natural" labeling is so open to interpretation suggests that it could hardly be viewed

as a federal law that "specifically permits" Frito-Lay to label its products "All Natural."  Fla. Stat. § 501.212(1).  In other words, the specificity that § 501.212(1) requires is exacting.  And courts have held defendants to task in requiring them to demonstrate that level of specificity.

For example, in *In re Horizon Organic Milk*, the court found that the FDA's statement that it would not object to defendants' labeling related to their products' brain and eye health benefits did not "specifically authorize[]" the defendant to make those claims, and did not "constitute [the FDA's] approval" of those representations.  2013 WL 3830124, at *24; *see also State of Fla.*, 420 F. Supp. 2d at 1310 (holding that defendant failed to "demonstrate that a specific federal or state law affirmatively authorized it to engage in the conduct" at issue); *Peters*, 2010 WL 1645095, at *4 (declining to afford defendant protection of safe harbor because it failed to show what specific provision of the "the Florida Brokerage Act that specifically permits it to charge a separate administrative brokerage fee").

Moreover, that the FDA has not issued warning letters to any producer of a food product that contains a genetically modified ingredient and is labeled "natural" does not show that Frito-Lay's conduct is "specifically permitted" by federal law.  *Cf. In re Horizon Organic Milk*, 2013 WL 3830124, at *25 ("An agency's decision not to bring an enforcement action against a corporation does not constitute approval of the corporation's actions.") (citing *Int'l Ctr. for Tech. Assessment v. Thompson*, 421 F. Supp. 2d 1, 9 (D.D.C. 2006)).[10]

Thus, Frito-Lay does not earn the protection of § 501.212(1)'s safe harbor because it is unclear whether FDA's voluntary guidance on "natural" labeling is "federal law" within the

---

[10] Finally, at least one court has held that, where a defendant fails on his preemption argument related to "natural" labeling, he likewise fails on his FDUPTA safe harbor argument.  *See Krzykwa v. Campbell Soup Co.*, --- F. Supp. 2d ----, No. 12-CV-62058, 2013 WL 2319330, at *5 (S.D. Fla. May 28, 2013) ("Plaintiff's claims are not preempted. Accordingly, Defendant's argument that Plaintiff's clams fall under FDUPTA's safe harbor provision correspondingly fails.").

meaning of this statute.  And even if it is, nothing in the guidance "specifically permits" Frito-Lay to label its products "All Natural" when they contain GMOs.  Therefore, this argument fails.

    2.  *New York*

For similar reasons, Frito-Lay's attempt to seek protection under the safe harbor provisions of the New York GBL also fails.  Section 349(d) provides that, in a deceptive practice action, "it shall be a complete defense that the act or practice is . . . subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission [sic] or any official department, division, commission or agency of the United States."  Likewise, § 350-d provides that, in any false advertising action, "it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York."  "Courts have construed § 350-d to be congruent with § 349(d) and also to cover regulations promulgated by federal agencies other than the FTC." *Marcus v. AT&T Corp.*, 938 F. Supp. 1158, 1173 (S.D.N.Y. 1996) (citing *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 144 (S.D.N.Y.1987) and *Mendelson v. Trans World Airlines, Inc.*, 120 Misc. 2d 423 (Sup. Ct. Queens County 1983)).

Again, it is not clear that FDA's guidance on "natural" labeling is a "rule or regulation" within the meaning of §§ 349(d) and 350-d.  Nor is it clear that Frito-Lay's labeling "complies with" the FDA's guidance.  And that the FDA does not specifically forbid the labeling at issue here does not necessarily afford Frito-Lay the safe harbors' protections.  *See Sclafani v. Barilla Am., Inc.*, 19 A.D.3d 577, 577 (2005) ("'[C]ompliance with regulations does not immunize misconduct outside the regulatory scope.'") (quoting *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 133 F. Supp. 2d 162, 175 (E.D.N.Y. 2001)); *cf. Am. Home Products Corp.*,

672 F. Supp. at 144-45 (S.D.N.Y. 1987) (implying that the safe harbor provisions apply only "where the FDA has explicitly endorsed the particular facet of the labeling which is claimed to be inadequate").  As such, the Court declines to dismiss Counts II and III pursuant to the safe harbor provisions of the GBL.

3.  *California*

Frito-Lay also seeks the protection of California's common law safe harbor from plaintiffs' UCL, FAL, and CLRA claims. [11]  According to this doctrine, "'courts may not use the unfair competition law to condemn the actions the Legislature permits.'"  *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 539, 542 (Cal. 1999)).  "If the Legislature has *permitted* certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.  When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."  *Alvarez*, 656 F.3d at 933 (quoting *Cel-Tech*, 973 P.2d at 541) (emphasis in *Alvarez*); *see also Bronson v. Johnson & Johnson, Inc.*, No. 12-CV-4184, 2013 WL 1629191, at *7 (N.D. Cal. Apr. 16, 2013) (Under California law, "the safe harbor defense to claims brought under the UCL or CLRA states that if the legislature has permitted certain conduct or considered a situation and concluded that no action should lie, courts may not override that determination.") (alterations, citation, and internal quotation marks omitted).  "To trigger the safe harbor, a statute must actually bar the action or clearly permit the conduct."  *In re Motor Fuel Temperature Sales Practices Litig.*, No. 06-CV-7621, 2013 WL 3795206, at *11 (D. Kan. July 19, 2013) (citing *Cel-Tech*, 973 P.2d at 541).  "The rule does not, however, prohibit an action under the UCL 'merely because some other statute on the subject

---

[11] Frito-Lay does not point to any case in which a court has applied this safe harbor to a claim under the FAL. Because the Court finds that Frito-Lay has failed to show it warrants the protection of a safe harbor, this claim stands.

does not, itself, provide for the action or prohibit the challenged conduct.'" *In re Motor Fuel Temperature Sales*, 2013 WL 3795206, at *11 (quoting *Cel-Tech*, 973 P.2d at 541); *see also Lopez v. Nissan N. Am., Inc.*, 135 Cal. Rptr. 3d 116, 132 (Cal. Ct. App. 2011) ("To forestall an action under the unfair competition law, another provision must actually bar the action or clearly permit the conduct.").

Defendants contend that § 110885 of the California Health and Safety Code affords them a safe harbor. Section 110885 states that the California Organic Products Act of 2003 "shall not apply to the term 'natural' when used in the labeling or advertising of a product." Cal. Health & Safety Code § 110885. The California Organic Products Act of 2003 applies, however, only "to all products sold as organic within the state, wherever produced, handled, or processed, and to all products produced, that are handled or processed in the state, wherever sold as organic." *Id.* § 110880. This Act prohibits labeling products organic when the products contain GMOs. *See id.* § 110830 (prohibiting organic label unless product complies with the USDA's National Organic Program).

Plaintiffs do not allege, nor do defendants assert, that the products at issue here are "products sold as organic." By the Act's very terms then, § 110885 does not apply to the products at issue here. But even if § 110885 applied, it does not "clearly permit" the defendants to label their products as "All Natural." *In re Motor Fuel Temperature Sales*, 2013 WL 3795206, at *11. Section 110885 merely provides that California's organic rules do not speak to whether one can label an organic product "natural." But when, if at all, labeling any product "All Natural" is permitted is not answered by § 110885. As such, the Court declines to dismiss Counts IV, V, and VI on the basis of California's common law safe harbor doctrine.

I.   Particularity of the Pleadings

Next, Frito-Lay argues that plaintiffs' claims under the FAL, UCL, CLRA, and FDUTPA (Counts IV, V, VI, and VII), as well as their intentional misrepresentation claims (Counts XI, XII, and XIII) must be dismissed for failure to plead them with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure.  Plaintiffs disagree.  The Court concludes that these claims meet the heightened pleading standard under Rule 9(b).

Rule 9(b) requires that, for claims sounding in fraud, "the circumstances constituting fraud . . . [must] be stated with particularity."  "To comport with Rule 9(b), a plaintiff must not only give the who, what, and when with regard to an alleged false or misleading statement, but also must 'give particulars as to the respect in which plaintiff contends the statements were fraudulent.'"  *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)).

Plaintiffs meet these heightened pleading requirements.  Plaintiffs allege that defendants PepsiCo and Frito-Lay (the "who") falsely stated that the products are "All Natural," but in fact, are not, because they contain GMOs (the "what") (FAC ¶ 1.)  When the defendants labeled, and the plaintiffs purchased, the products between January 1, 2010 and the present (the "when"), the plaintiffs relied on this representation, which was placed prominently on the products' packaging (the "where") (*Id.* ¶¶ 37, 1).[12]  Plaintiffs go even further in describing the fraudulent nature of defendants' "All Natural" representation.  They allege that the products contain GMOs, and that GMOs are not natural because they are modified "by the insertion of DNA material from outside

---

[12] Plaintiff Shake purchased the products once per month in 2011.  (FAC ¶ 17.)  Gengo purchased them once per month from approximately 2010 to September 2011.  (*Id.* ¶ 18.)  Zuro purchased them once per month from 2010 to December 2011.  (*Id.* ¶ 19.)  And Summerlin purchased them once per month from "at least" 2010 to November 2011.  (*Id.* ¶ 20.)

the organism into the plant's DNA sequence, allowing the plant to express novel traits that

normally would not appear in nature."  (*Id.* ¶¶ 42, 44.)

Indeed, the First Amended Complaint provides even greater detail than that found to be

sufficient under Rule 9(b) in *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066 (E.D.

Cal. 2010).  There, the plaintiffs alleged that, between March 2005 and March 2009, the

defendant labeled its products "all natural," but such products were not "all natural" because they

contained high fructose corn syrup.  *Id.* at 1077.  The plaintiffs showed the "where" by including,

in their complaint, copies of the products' labels, as plaintiffs did here.  *Id.*  But for the "all

natural" label, the complaint in *Von Koenig* alleged, the plaintiffs would not have purchased the

products.  *Id.*

Similarly, the court in *In re ConAgra Foods, Inc.* considered claims sounding in fraud

arising out of the defendant's labeling of oil as "100% Natural."  908 F. Supp. 2d at 1100.  The

complaint alleged that the plaintiffs purchased the product within a specified time frame – the

class period – with a given frequency (the "when"), that the label appeared on the packaging (the

"where") during the class period (another "when"), and that the label was false and misleading

because the product contained bioengineered ingredients, and such ingredients are not all natural

(the "how").  *Id.* at 1100-01.  The same level of detail and then some are provided in the

allegations presented here.  *See also Jones*, 912 F. Supp. 2d at 902; *Astiana*, 2011 WL 2111796,

at *6.

Contrary to Frito-Lay's assertions, the plaintiffs are not required to plead precisely where

they purchased the products.  *See In re ConAgra Foods Inc.*, 908 F. Supp. 2d at 1099 (holding

that Rule 9(b) did not require plaintiffs to allege what specific store they purchased the product

misleadingly labeled "all natural").  Frito-Lay also points to no case holding that plaintiffs must

allege at what price they purchased the products, and the Court finds no reason to require such pleading – it is not the who, what, where, when, or how of the claim.[13]

To the extent plaintiffs' claims are predicated on advertising and marketing materials beyond the products' labeling, the Court agrees with Frito-Lay that the First Amended Complaint is deficient under Rule 9(b).  Plaintiffs allege that Frito-Lay advertised the products as "All Natural" in "print advertisements (e.g., coupons or magazine advertisements), both visually and audibly in television commercials, and on the Frito-Lay and SunChips websites."  (FAC ¶ 36.) They also allege that plaintiff Gengo became aware of the "All Natural" claim in part through "print media advertising."  (*Id.* ¶ 18.)  Similarly, Zuro became aware of the products' "All Natural" pedigree in part through "print media advertising."  (*Id.* ¶ 19.)  Shake and Summerlin appear to have learned that the products were "All Natural" only through their packaging.  (*Id.* ¶¶ 17, 20.)

"In a deceptive advertising case, Rule 9(b) requires that the plaintiff(s) identify specific advertisements and promotional materials; allege when the plaintiff(s) were exposed to the materials; and explain how such materials were false or misleading."  *Janney*, 2013 WL 1962360, at *11 (citations omitted).  In *Janney*, the plaintiffs failed to allege with particularity "any misrepresentations made in . . . online sources."  They did not specify what the exact "false or misleading statements are . . . where exactly the statements are located, or which statements plaintiffs relied on."  *Id.*  As such, the court dismissed the claims sounding in fraud.

Here, too, plaintiffs allege generally that Frito-Lay represented the products as "All Natural" in advertising and online, but they do not set forth the where, when, or what with sufficient particularity.   In other words, one cannot glean from the First Amended Complaint

---

[13] In any event, the First Amended Complaint states the approximate prices per ounce of the Tostitos, SunChips, and Bean Dip products.  (FAC ¶ 66.)

whether the marketing and advertising to which plaintiffs were exposed, and whether that

material is identical to, or in what ways is different from, the "All Natural" stamp that appeared

on the products' packaging.  Thus, to the extent plaintiffs' claims are predicated upon allegedly

false and misleading representations occurring anywhere other than on the products' packaging,

they are dismissed.[14]

Frito-Lay next argues that the intentional misrepresentation claims must be dismissed

because plaintiffs fail to allege sufficient facts to give rise to an inference of fraudulent intent, as

is required by both Rule 9(b) and under state law.[15]  "The requisite 'strong inference' of fraud

may be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d

1124, 1128 (2d Cir. 1994) (citations omitted).  Frito-Lay contends that plaintiffs' allegation –

that it and PepsiCo "knew the products were not 'all natural' because they contained GMOs" – is

conclusory and insufficient under Rule 9(b).  (FAC ¶¶ 170, 178, 186.)  Indeed, this allegation

alone would be insufficient.  *See Liberty Mutual Ins. Co., WAWA Tours, Inc.*, No. 07-CV-880,

2007 WL 2743500, at *7 (E.D.N.Y. Sept. 18, 2007) (finding plaintiff's allegations that

defendants "intentionally and materially misrepresented" certain facts and that defendants knew

---

[14] Likewise, Frito-Lay may be correct that plaintiff Shake's failure to plead, with particularity, the specific products he purchased, would be fatal to his FAL, UCL, CLRA, and FDUTPA claims.  *See Jones*, 912 F. Supp. 2d at 902-03 (dismissing claims under Rule 9(b) where plaintiffs failed to allege "details of exactly which products they purchased").  But none of these claims appear to be brought by or on behalf of Shake, in particular.  The UCL, FAL, and CLRA claims are brought on behalf of California classes, (FAC ¶¶ 108, 117, 127) and the FDUTPA claim is brought on behalf of the Florida classes, (*id.* ¶ 139.)  Plaintiffs Gengo and Zuro purport to represent the California class.  (*Id.* ¶ 72.)  Plaintiff Summerlin purports to represent the Florida class.  (*Id.* ¶ 73.)

[15] Under New York law, to state an intentional misrepresentation claim a plaintiff must allege, among other elements, that the defendant intended to defraud the plaintiff.  *See Hughes v. Ester C Co.*, No. 12-CV-41, 2013 WL 1080533, at *25 (E.D.N.Y. Mar. 15, 2013) (citations omitted).  Under California law, a plaintiff must similarly allege "intent to defraud, i.e., to induce reliance."  *Mitsui O.S.K. Lines, Ltd. v. SeaMaster Logistics, Inc.*, 913 F. Supp. 2d 780, 786 (N.D. Cal. 2012) (internal quotation marks and citations omitted).  The same is true under Florida law.  *See Nichols v. Wm. Wrigley Jr. Co.*, No. 10-CV-80759, 2011 WL 181458 (S.D. Fla. 2011) (plaintiff must allege facts demonstrating "the representor's knowledge that the representation is false" and an intention to induce the plaintiff to act on the false statement, among other elements).

them "to be false or in reckless disregard of their accuracy" insufficient to establish a strong

inference of fraudulent intent). Plaintiffs attempt to rely on additional allegations in the First

Amended Complaint to demonstrate the requisite specificity. Plaintiffs point to their allegations

that Frito-Lay desired to increase sales and revenue by labeling the product "All Natural" as

demonstrating that Frito-Lay had a "motive and opportunity to commit fraud." *Shields*, 25 F.3d

at 1128. The PepsiCo CEO stated that consumers want more all natural snacks and are "voting

with their wallets." (FAC ¶ 32.) Frito-Lay charged a premium price for their all natural snacks.

(*Id.* ¶¶ 65-66.)

      Notwithstanding these allegations, the pleadings are not sufficient. As Frito-Lay points

out, a court cannot infer from allegations showing that the wrong-doer made more money a

motive and opportunity to commit fraud. As the Second Circuit has instructed, the "motive"

must "entail concrete benefits that could be realized by one or more of the false statements . . .

alleged," *Shields*, 25 F.3d at 1130, and allegations of a company's motive that would "'pertain to

virtually any company that manufactures and distributes goods'" do not suffice, *Chill v. General

Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (quoting *In re Crystal Brands Sec. Litig.*, 862 F.

Supp. 745, 749 (D. Conn. 1994)). Frito-Lay's generalized motive to satisfy consumers' desires,

increase sales and profits, "does not support a strong inference of fraudulent intent." *Chill*, 101

F.3d at 268; *see also Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x

679, 681 (2d Cir. 2004) (summary order) ("The complaint in this case does not ascribe to

Goldman or TCW any particular motive for committing fraud beyond a general

profit motive common to all corporations, which does not suffice.").

      In the alternative, plaintiffs contend that they allege sufficient facts to demonstrate

"strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at

1128.  In support, plaintiffs point to their allegation that an independent laboratory test confirmed the presence of GMOs in the products, (FAC ¶50), as well as allegations as to why GMOs are not natural, (*id*. ¶¶ 43-48), to argue that Frito-Lay "could have easily had their products or ingredients tested for GMOs (if they had wanted to know the truth about whether their products contained GMOs)."  (Pls.' Opp'n at 29.)  Nowhere in the First Amended Complaint do plaintiffs allege that Frito-Lay knew the products contained GMOs.  Plaintiffs allege that the products contain GMOs, (FAC ¶ 49), and that Frito-Lay deliberately marketed the products as "All Natural" to appeal to consumers, (*id.* ¶ 52), but plaintiffs never allege that Frito-Lay knew the products contained genetically modified corn.  If Frito-Lay did not know that the products contained GMOs, then Frito-Lay could not have had knowledge of the falsity of their representation that the products were "All Natural."  Without knowledge of the falsity, Frito-Lay could not have intended to defraud plaintiffs.

    At best, then, these allegations could show negligence on the part of Frito-Lay because it should have known the products contained GMOs.  But they do not constitute "strong circumstantial evidence of conscious misbehavior or recklessness," because nowhere do plaintiffs allege that Frito-Lay avoided the obvious truth about whether the products contained GMOs or was highly unreasonable in failing to know that the products contained GMOs or to test the products for GMOs.  *Shields*, 25 F.3d at 1128; *see also Johnson v. Siemens AG*, No. 09-CV-5310, 2011 WL 1304267, at *15 (E.D.N.Y. Mar. 31, 2011) ("An inference of recklessness may, 'in some cases,' be drawn where the plaintiff demonstrates '[a]n egregious refusal to see the obvious, or to investigate the doubtful[.]'") (quoting *Chill*, 101 F.3d at 269); *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 271 (E.D.N.Y. 2002) ("[T]he plaintiffs must show that they alleged conduct by the defendants which is at the least . . . highly unreasonable

and which represents an extreme departure from the standards of ordinary care to the extent that

the danger was either known to the defendant or so obvious that the defendant must have been

aware of it.") (citations and internal quotation marks omitted).

Accordingly, the intentional misrepresentation claims (Counts XI, XII, and XIII) are

dismissed.

J.   Express Warranty Claims

Defendants next argue that plaintiffs' breach of express warranty claims under New

York, California, and Florida law (Counts VIII, IX, and X, respectively) must be dismissed

because the products' "All Natural" label on the packaging is not an express warranty, but rather

mere labeling on a package.  Second, they argue that the Florida and New York warranty claims

must be dismissed because the plaintiffs did not provide pre-litigation notice.  Finally, they argue

that the Florida warranty claim must be dismissed because the plaintiffs were not in privity with

defendants.  The Court addresses each argument in turn.

1.   *Is the Product Label a Warranty?*

Under New York, California, and Florida law, "any affirmation of fact or promise made

by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain

creates an express warranty."  N.Y.U.C.C. Law § 2-313(1)(a); Cal. Commercial Code §

2313(1)(a); Fla. Stat. § 672.313(1)(a).  Moreover, "[a]ny description of the goods which is made

part of the basis of the bargain creates an express warranty that the goods shall conform to the

description."  N.Y.U.C.C. Law § 2-313(1)(b); Cal. Commercial Code § 2313(1)(b); Fla. Stat. §

672.313(1)(b).

In *Vicuna*, the court held that the plaintiffs adequately alleged that the "all natural" label

on a potato product was "a description of the potato products, or a statement of fact about the

potato products" and thus adequately alleged an express warranty claim.  2012 WL 1497507, at

*2.  This case is no different.  And the cases upon which defendants rely are easily distinguished.

There was no express warranty created in *Werbel v. Pepsico, Inc.*, No. 09-CV-4456, 2010 WL

2673860, at *5 (N.D. Cal. July 2, 2010) because the alleged express warranty – "contains

berries" – was nowhere to be found on the packaging of the product at issue, Cap'n Crunch.

Here, the "All Natural" label is displayed on all of the products' packaging.  The plaintiffs in

*Anderson v. Bungee Int'l Manufacturing Corp.*, 44 F. Supp. 2d 534, 541 (S.D.N.Y. 1999) failed

to show that the labels "Made in the USA" and "Premium Quality" were part of the basis of the

bargain, but plaintiffs here adequately allege that they relied on the "All Natural" representation

in purchasing the products.  As such, the Court will not dismiss Counts VIII, IX, and X on the

basis that the products' "All Natural" labels do not create express warranties.

      2.  *Notice*

Next, Frito-Lay contends that the plaintiffs' express warranty claims arising under

Florida and New York law must be dismissed because the plaintiffs did not provide notice to the

defendants prior to commencing the litigation.  In response, plaintiffs argue that the notice

provided by the California plaintiff  (either Gengo or Zuro, as plaintiffs do not specify) serves as

sufficient notice as to the Florida and New York plaintiffs' claims.  The Court is inclined to

agree with Frito-Lay, but will dismiss these claims on wholly separate grounds.

Under both Florida and New York law, "the buyer must within a reasonable time after he

discovers or should have discovered any breach notify the seller of breach or be barred from any

remedy."  N.Y. U.C.C. § 2-607(3)(a); Fla. Stat. § 672.607(3)(a).  Plaintiffs fail to allege in the

First Amended Complaint that they even provided sufficient notice to defendants of their express

warranty claims under Florida and New York law, let alone notice within a reasonable time after

50

discovery of a breach.  Plaintiffs simply allege that "All conditions precedent to Defendants'

liability under this contract have been performed by the Plaintiffs and other members of the

Classes when they purchased the Products for their ordinary purposes."  (FAC ¶¶ 150, 164.)  The

plain import of this allegation is that plaintiffs gave notice of their breach of warranty claims by

virtue of their purchasing the products at issue.  But this cannot suffice.  It would be novel indeed

to find that notice of a breach of contract – *i.e.*, breach of the warranties provided therein – was

provided at the moment the parties entered into the contract.  For these reasons alone, the breach

of warranty claims under Florida and New York law (Counts VIII and X) must be dismissed.

While the Court need not reach it, a thornier question arises when considering plaintiffs'

argument that the notice provided by a California plaintiff was sufficient to alert defendants of

the same claims by other plaintiffs from other states.  That notice here, provided by the plaintiff's

law firm on behalf of the firm's client, identified as "a resident of California . . . and other

consumers," states that Frito-Lay's practices of selling products labeled "All Natural" that

contain GMOs "constitute a breach of warranty."  (Ex. A to FAC.)

Without deciding the issue, such notice is likely insufficient as to any plaintiff other than

on whose behalf it was provided.  The primary purpose of the notice requirement is "to inform

the seller that, even though his tender has been accepted by the buyer, his performance is

nonetheless considered a breach of contract."  *E. Air Lines, Inc. v. McDonnell Douglas Corp.*,

532 F.2d 957, 971 (5th Cir. 1976).  As such, "it is not enough . . . that a seller has knowledge of

the facts constituting a nonconforming tender; he must also be informed that the buyer considers

him to be in breach of the contract."  *Id.* at 973.  Thus, one court has held that it is not enough to

argue that plaintiffs met the notice requirement where the defendant was clearly aware of the

potential defect in the product because "generalized knowledge" about the defect does not make

the seller aware "that this particular transaction is troublesome and must be watched." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 590 (Ill. 1996) (internal quotation marks omitted); *see also* N.Y. U.C.C. § 2-607 and Fla. Stat. § 672.607 Official Cmt. 4 ("The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched."); *Am. Mfg. Co. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 7 F.2d 565, 566 (2d Cir.1925) ("The notice of the breach required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach."); *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 682-83 (E.D. Pa. 2011) ("[E]ven assuming that Defendants were aware that the fentanyl patches were defective, Defendants may not have been aware of Plaintiffs' intent to file a class action lawsuit, and were denied the opportunity to negotiate or settle this claim without judicial involvement."). As such, the notice requirement is met when the seller "is somehow apprised of the trouble with the particular product purchased by a particular buyer." *Connick*, 675 N.E.2d at 590.

The letter from the California plaintiff – who is unidentified – purports to provide notice on behalf of "other consumers," but such notice is quite ambiguous and open-ended and does not readily signal that claims are brought on behalf of the other named plaintiffs in this case. That at least one plaintiff – and we do not know whether it was Gengo or Zuro – was dissatisfied with her purchases does not necessarily inform the defendants that other potential plaintiffs were similarly dissatisfied. Indeed, for similar reasons, in addressing a Rule 23 certification motion, the court in *Cohen v. Implant Innovations* held that each putative class member would have to demonstrate that she gave the required notice to the defendant of her breach of warranty claim; blanket notice on behalf of the entire class was not enough. 259 F.R.D. at 625.

Thus, this Court has concerns with the sufficiency of notice provided by an unnamed California plaintiff as to claims brought by Florida and New York plaintiffs. Again, however, as discussed above, plaintiffs' express warranty claims arising under Florida and New York law must be dismissed for reasons wholly separate and apart from the issues raised by the California notice.

     3.  *Privity*

Finally, Frito-Lay argues that the plaintiffs' breach of warranty claim under Florida law must be dismissed because the First Amended Complaint does not allege that plaintiff Summerlin was in privity with Frito-Lay, a requirement under Florida law. Plaintiffs dispute that privity is, in fact, required under Florida law. The Court declines to address this argument at this stage because, as discussed above, there are separate grounds for dismissal. The Court notes, however, that whether privity is required for express warranty claims is a difficult question. As one federal district court in Florida observed, "'warranty law in Florida has become filled with inconsistencies and misapplications in the judiciary's attempt to provide justice to the injured consumer.'" *Smith v. Wm. Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1342 (S.D. Fla. 2009) (quoting *West v. Caterpillar Tractor Co.*, 336 So.2d 80, 92 (Fla. 1976)). The court further observed that the Florida Supreme Court has yet to clarify whether privity is required for express warranty claims. *Smith*, 663 F. Supp. 2d at 1342.

K.  Equitable Relief

Frito-Lay's final argument is directed to plaintiffs' claims seeking equitable relief – those brought under GBL §§ 349 and 350, the FAL, UCL, and CLRA (Counts II, III, IV, V, and VI, respectively). Frito-Lay maintains that these claims must be dismissed because plaintiffs have an adequate remedy at law. Plaintiffs retort that they properly pled claims for equitable relief in the alternative. Plaintiffs are correct.

Rule 8 of the Federal Rules of Civil Procedure specifically permits plaintiffs to plead in the alternative.  It provides:

> (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

> (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

Fed. R. Civ. P. 8(d)(2)-(3).  "Legal and equitable grounds may be pled alternatively, or even inconsistently."  *Torsiello v. Strobeck*, --- F. Supp. 2d ----, No. 12-CV-3302, 2013 WL 3286157, at *9 n.6 (D.N.J. June 27, 2013) (citing Fed. R. Civ. Pr. 8(d)(2)-(3)).  While Frito-Lay is correct that, as a general proposition, if plaintiffs have an adequate remedy at law they cannot obtain equitable relief, it is too early to dismiss claims seeking solely equitable relief.  *See Brown v. Toscano*, 254 F.R.D. 690, 699 (S.D. Fla. 2008) ("'Although equitable relief ultimately may not be awarded where there exists an adequate remedy at law, Plaintiff certainly may plead alternative equitable relief.'" (quoting *Adelphia Cable Partners, Inc. v. E & A Beepers Corp.*, 188 F.R.D. 662, 666 (S.D. Fla. 1999))).  "'Dismissal of plaintiff's alternative theories at this stage would violate the liberal policy" of Rule 8(d)(2), "'which allows plaintiffs wide latitude in framing their right to recover.'"  *Nat'l City Commercial Capital Co., LLC v. Global Golf, Inc.*, No. 09-CV-0307, 2009 WL 1437620, at *1 (E.D.N.Y. May 20, 2009) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 40 (S.D.N.Y. 1991)).[16]

---

[16] Frito-Lay also contends that the intentional misrepresentation claims under New York, California, and Florida law (Counts XI, XII, and XIII, respectively) appear to seek no relief at all, and should be dismissed.  Because these claims were dismissed for a different reason, the Court does not address this argument, but does note that the First Amended Complaint contains a general request for relief and requests for both monetary damages and equitable relief.  (*See* FAC 52-53.)

### III. Leave to Amend and Discovery

In a footnote, plaintiffs seek leave to amend their complaint. This request is denied without prejudice to renew. Notwithstanding the Case Management Order previously entered, any request to amend shall proceed pursuant to this Court's Individual Rule III.A.2, and any request to amend must be made by letter application within thirty days of the date of this Memorandum and Order. The letter shall address the legal bases upon which any proposed motion would be based, and further address why any amendment(s) would not be futile or inconsistent with this Memorandum and Order. A proposed Second Amended Complaint must be appended to the letter request. Discovery shall proceed pursuant to the Case Management Order under the supervision of the assigned magistrate judge.

### CONCLUSION

For the foregoing reasons, defendants' motion to take judicial notice of certain documents is granted, and their motion to dismiss is granted in part and denied in part as follows:

1) All claims against defendant PepsiCo are dismissed without prejudice;

2) The Magnuson-Moss Warranty Act claim (Count I) is dismissed with prejudice;

3) The New York General Business Law claims (Counts II and III) are dismissed with prejudice only as to non-New York plaintiffs;

4) The New York warranty claim (Count VIII) is dismissed with prejudice only as to non-New York plaintiffs. This claim is otherwise dismissed without prejudice;

5) The Florida warranty claim (Count X) is dismissed without prejudice;

6) The New York intentional misrepresentation claim (Count XI) is dismissed with prejudice only as to non-New York plaintiffs. This claim is otherwise dismissed without prejudice;

7) The California and Florida intentional misrepresentation claims (Counts XII and XIII) are dismissed without prejudice;

8) To the extent the Unfair Competition Law, False Advertising Law, Consumer Legal Remedies Act, and Florida Deceptive and Unfair Trade Practices Act claims (Counts IV, V, VI, and VII) are predicated on "All Natural" representations appearing anywhere other than on the products' packaging, the claims are dismissed without prejudice; and

9) All other claims shall proceed consistent with this Memorandum and Order.

Plaintiffs' request to amend is denied without prejudice to renew consistent with this Memorandum and Order.  Discovery shall proceed pursuant to the Case Management Order under the supervision of the assigned magistrate judge.

SO ORDERED.

Dated: Brooklyn, New York
      August 29, 2013

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge